Good morning, Your Honors. May it please the Court, Mark Herron for the Opponent, William Kitchens. I'd like to reserve three minutes for rebuttal. Although mental health patients such as Mr. Kitchens may be detained civilly under California law, the Due Process Clause of the 14th Amendment guarantees that such civil detainees cannot be punished on behalf, on account of their mental health status. Here, Mr. Kitchens was subjected to punitive confinement in violation of his constitutional rights. What was punitive about it as compared to what persons in similar, same-as-similar circumstances in detention would have received? When I mean the same-as-similar circumstances, I want you to take into consideration that under 4002B of the Penal Code, he had to be segregated from common criminals because he was a sexually violent predator. You call him a mental health person, it sounds like he has a slight delusion, but the fact of the matter is that he's a convicted sexually violent predator and he's being held for civil detainment for two years and two years and two years, etc. All right. Now, if he had to be segregated under 4002B and he had to be put not with MSEG persons who were civil detainees, and he couldn't be put with a regular prison population as to which there's no proof that they even existed, but let's leave that to the side. And he had two places where he could be placed, isolation and what is called the two-person segregated administrative holding, which is formidably called the hole at Fresno, right? Right. Where's the punishment in relation to the other occupants of those two places? If I could back up just a little bit. All right. First of all, there was another location, which is the jail has a location where it holds ordinary non-SVPA civil detainees. And where's the citation to the record as to that? The Mr. Lieutenant Johnson's affidavit, which is ER 79, states that it was the jail's policy not to hold SVPA detainees in the space with the ordinary civil detainees. And that implies that there is such a space and there was space available to him. It is not in the record whether there was space available to him. The records reflect that he was not placed there because it is the policy of the jail not to do so. And that affidavit implies the existence of such a location. That's correct. In addition to that, Your Honor, let's keep in mind the SVPA laws were enacted or took effect in 1996. These took place in 2005. The jail has had nearly a decade to come up with a place. If they don't want to house SVPA detainees along with, quote, ordinary civil detainees, the jail has had nearly a decade to come up with a place to do that. And they've simply not done that. They said the policy is going to be to put them in isolation. In addition, Your Honor — What we're looking here for is not the best or whatever. We're looking for what's reasonable. Right. Okay. So they come in, and there's four days where he's been put in the wrong place, but it's because they make a mistake. There's 14 days where he was housed with ordinary criminal detainees. Now, as I understand it, what happened when they came in, there was a mistake made. Either the paperwork wasn't proper or something else. That's what they claim, yes. Now, are you charging those 14 days as part of your argument? Absolutely, because — Because they made a mistake. Well, because he was housed with ordinary criminal detainees. I understand. And in order to rebut — so there is no dispute here that there was presumption, both with that initial 14-day and with the later isolation into and whole, a presumption of punitive conditions. What they had to do was come forward with a legitimate nonpunitive interest and show that the conditions that they imposed on him were not excessive in relation to that interest. But you don't get to that point unless you say that they're automatically charged with the knowledge, even though the input people made a mistake. Well, this is part of the issue. The reason that the mistake occurred was because the supervisors did not give the jail staff the tools with which to verify. He — Mr. Kitchens told them when he arrived, I'm a civil detainee. You cannot house me with ordinary criminal detainees. He told them repeatedly throughout his detention there. And the jail staff was never given the tools by their own admission to figure out whether or not he was a criminal. This came — he came from a Tascadero. That's correct. It was a Tascadero's responsibility to make that identification. Apparently, the paperwork wasn't sufficient for that. Well, the judge ordered — I mean, after all, you know, when they come in, they say a lot of things, but they have to be able to identify some. There is an order from the superior court judge that ordered him to be transferred to the Fresno County Jail for his appearance. And that order clearly states that he is a civil detainee being held and is to be administratively segregated. What is the mistake, then, that the briefs talk about? The mistake is that they did not have access to that order. They claimed that they did not have access to that order, that the computer system they had access to his criminal record, but not to the order from the Fresno County. Okay. So there's nothing indicating they were lying or anything? No, and we don't take the position that they were. We take the position that — Okay, so when they did find out, then they had a responsibility to do something about it. And they put him — they segregated him because, as they say, at that time they didn't have an appropriate two-person cell. That's right. And they put him in isolation. And the problem — Alone. Excuse me. I'm sorry? Alone. Initially alone, and then they housed him later on in essentially the same conditions with another person who was also an SVPA detainee. And to that time, when he was with a person in a similar situation, you're not claiming that was a violation? Yes, absolutely we are, Your Honor, because it's not simply the fact that he was held alone. It's the fact that all of the privileges were taken from him. He was only allowed to leave his cell for 10 minutes every other day. I thought — well, I understand that part of it. But are you arguing that when they put him with another person similarly situated, there was a violation? He was not allowed — By that reason alone? This Court held in Jones v. Bonds. It's not the fact — Could you give me a yes or no? I'm sorry. I misunderstood your question. It's not the fact that he was housed with someone else. It's the conditions of the confinement while he was being held. As far as the condition, as far as where he was housed, you're not taking the position that that was a violation because they put him with another person similarly situated. The fact that — That's your argument that they should have done it at the beginning. That's exactly right, Your Honor. Okay. So it's the restrictions of being in that type of housing that they're not secured with people who don't have any tails wagging the dog. This Court held in Jones v. Bonds that the defendants cannot simply throw up their hands and say, we have to keep them separate. Therefore, we can strip them of all of these privileges. This Court held that in order to rebut the presumption of punitive conditions that concededly does arise here, they have to explain why — how the bevy of restrictions that he faced while he was being confined was not excessive in relation to the purpose of keeping civil and criminal detainees separate. They've never even attempted to make that explanation. You said it's concededly — That the presumption — Concededly presumption of punitive damages. Punitive conditions. Do you have a citation to the briefs of the appellees where they concede that? I'm sorry. Don't. I can pull that up and let you know during rebuttal. But the district court even applied the presumption. That's at ER 14. Okay. The — when he was first placed in the isolation, I guess you want to call it. That's what the term is that the jail uses. Was there — that cell that he was later put in with the other person, was that available and they just didn't want to have a single person in it? I — the jail policy is that they don't, quote, waste bed space. I know. So I don't know — I don't believe that there was — I believe that there was another cell available, but they didn't put him in it. But even had they done that — It still would be — It still would be a violation because all of the privileges were stripped from him, and there was — there's no basis for doing that. He had no exercise privileges, no yard privileges. He was only allowed to leave his cell for 10 minutes every other day. And he's — as I said, this court held in Jones. Can I — Yes. I just want to get these facts straight. Absolutely. Besides the 14 days, which, you know, may or may not be sufficiently punitive. I don't want to get into that right now. Besides those 14 days, how much time was he spent totally in this — how much time did he spend in this situation where he had no privileges? I believe that was 25 days. So the two things together, the isolation and the two-man cell. I believe he was in isolation for nine days and in the two-man cell for 16 days. Thank you. That's just what I want to know. Fourteen days in isolation. Fourteen days. And I'm sorry, nine days in isolation, I believe, and 16 days in the two-man cell. I may have that math wrong, but — Just a day or two off, but it won't make any difference. Let me ask you another question before the clock — we have a trap door, you just — The trip from Atascadero down to the jail, they had to bring him down because they got an order from the court to bring him down. They had in this vehicle, as I understand it, women, two women, and they got the separation, not the men. That's correct. Now, what is your position as far as the transporter is concerned? Do they have to have some sort of a vehicle that will function such that the women are pushed out with the men, or are they required to leave him there, even though there's a court order saying you have to get him down to prison? There's — they could have still segregated the women if they had brought another vehicle. There's no — They could have been five vehicles, but as I understand it, we test this as was they acting reasonably. Well, Your Honor, I don't know that that is the correct test. It's actually cut and dry. Well, he — If you don't do it, you're out. It's whether he was given due process, and he has a due process right under California law not to be put or kept in the same room, and that due process right was taken from him without any — Is it in the same room or segregated? It's — the way that the statute reads, 4002A, is that he cannot be put or kept in the same room. Housing is the word used. I'm sorry? It's housing, right? Well, 4002A is not limited to housing. There's nothing that says that it's housing. It just says that he cannot be — Well, these were pretty well segregated. They were put into manacles and kept separate from the men, and the women were kept separate by — in another place. Well, there is evidence in the record, actually, that one of the criminal inmates had a hand free, and — One hand free. Yes. So the shackling didn't necessarily — and that's not what the statute reads. I mean, the segregation that's talked about in the statute is not he can be put or kept in the same room as long as you're shackled. So what you're saying is that because of the due process requirements, they could not transport him in that vehicle unless they put the women out with the men. Or got a different vehicle for the women or got a different vehicle — I said that vehicle. In that vehicle to put all of them together unless they put the women in with the men. That's correct. So your view is then the only way to comply was to put the women out with the men and let him be in the segregated area. I don't think so. I think they could have brought another vehicle. There's nothing in the record that says they couldn't have brought another vehicle. So that's what I'm getting at. So you're saying that the due process requires that in that situation they had to keep him in a Tascadero until they could get another vehicle. That could have been one of the ways that they could have. Do you have any others? Or brought another vehicle that same day to a Tascadero. Yes. There's nothing to indicate that that was unreasonable. They bring one vehicle. There's nothing to show that the transporter knew of this situation before they left the place to go to the Tascadero. Well, that's not what their argument is. Their argument is just that they didn't have to do it. They haven't argued in their briefs that they didn't know about it. We've taken you over your time, but we'll give you a minute for a rebuttal. Thank you. Now we'll hear from the appellee. Good morning, Your Honor. Scott Reddy appearing on behalf of the appellees, the transport defendants. And I just want to pick up on kind of where we left off here and draw a distinction between Section 4002A and 4002B. The appellants' main argument in their briefs with respect to the transport appellants or appellees are that Section 4002A applies, which has a somewhat arguably broader term than the secure housing terms used in 4002B. The problem is that if you read the actual statutory language, and I want to point this out because I don't know if it's clearly delineated in the briefs, 4002A doesn't apply to this situation. If you look at the language of 4002A, it begins by saying persons committed on criminal process and detained for trial, which we don't have here, persons convicted and under sentence, which we don't have here, and persons committed upon civil process, which we don't have here. Mr. Kitchens here was being held pending a determination whether he should be committed. That scenario falls directly within Section 4002B, which begins inmates who are held pending civil process under the SVP statute. So 4002A doesn't even come into play here because Mr. Kitchens doesn't fit within the parameters of that language. And so we have to start the analysis by looking at Section 4002B, which is the arguments made in our briefs. And under 4002B, the language that it discusses is he has to be administratively segregated, which means separate and secure housing. There's no way that separate and secure housing can be meant to include the transportation on a vehicle from the hospital to the jail. Why not? Because it's talking about housing. And if someone is being transported somewhere, they're not being housed on the bus. And if you read the whole language of the statute, it's talking about secure housing in the jail system. I see. So there's no way that even a well-speculative court could say that housing includes housing in a vehicle in transporting them from the Tuscadero to the jail? It's the appellee's position to know that that would be an unreasonable interpretation of the statute. So what does govern the transport? What law does govern the transport? You said A doesn't and B doesn't. I think the transport would be covered by the order submitted by the judge. And if you read through the order, it talks about its cites to 4002B, obviously. But it just says simply that they have to transport Mr. Kitchens from Tuscadero to the county jail. And I think under the Due Process Clause, they just have to do it reasonably. And I think the facts in this case indicate that they acted incredibly reasonably under the circumstances. They had two female prisoners. Incredibly, in the sense we should not believe it? They acted reasonably. Let's take out the incredible. I take it to make sure that there's not a security problem. They're supposed to be shackled, right? Correct. And that's their practice and routine to do that. There was an allegation, which I suppose is a disputed fact, that there was one hand that was free. There is that allegation, correct. Okay. And but the person also has leg shackles? Correct. And they're shackled to some kind of chain or something so they can't move around the bus? Correct. Okay. Thank you. And, in fact, nothing actually happened during the transportation. And I just want to briefly – I only have about 30 seconds left of my time. There's an argument made that the transport defendants are also somehow responsible for bringing Mr. Kitchens into the booking area and leaving him there. And I'd invite this Court to look at the record and look at the citations, because you'll find that there isn't a single citation in the record or a single piece of evidence which actually shows that the transport defendants were responsible for bringing Mr. Kitchens into the booking area. There are a couple citations in the brief, but if you actually look them up, that's not what the evidence is. And, in fact, if you look at the unverified complaint that was filed, there is an allegation in there as to transport itself. Transport was actually dismissed. The only remaining allegations are against the individual defendants. And if you look at those allegations, there are no such allegations. And with that, I will submit, Your Honors. All right. Would you please reset the clock at six minutes so that counsel can have what has been agreed to as his time and views that we ran over with Mr. Herron? May it please the Court, Roy Santos, on behalf of Apelles, Mims, and Johnson. The critical issue before this Court is whether Apelles, Mims, and Johnson can be held liable in their individual capacity for simply being members of the chain of command at the Fresno County Jail. It's undisputed in this case that Apelles, Mims, and Johnson had no direct participation in appellant's housing at the Fresno County Jail. They were unaware that he was even in the jail until this action was filed. But are they responsible for the policy that basically puts this space thing over all and responsible for policy that allows these pre-committed sexual offenders to be put in isolation and not have any of the normal privileges of the other prisoners? Your Honor, it's undisputed that. And, in fact, it's conceded by appellant that defendants or, sorry, Apelles, Mims, and Johnson do not have any policy-making authority. The policy-making authority is strictly in the purview of the sheriff and the board of supervisors. So they had nothing to do with the fact that he was at all, that he was placed in an isolation situation? No, ma'am. Well, let me ask you this. Did they know he had been placed in an isolation situation, and did they give orders that he be maintained in the isolation situation? No. It's undisputed in the record that they made no decisions, nor has appellant cited anything in the record. First of all, knowledge and acquiescence. Do you admit that the record shows that they knew that he was in isolation and they did nothing about it? No, we do not concede that issue, Your Honor. It is clear from the record that Apelles, Mims, and Johnson had no knowledge of him being housed at all in the jail. Apelles, Mims did have knowledge of the policy regarding housing of SVP civil detainees. However, pursuant to the precedent in Edgerly v. City and County of San Francisco, she cannot be held liable in her individual capacity simply by enforcing the policy put into effect by the policymaker, which was the sheriff and the board of supervisors. Wasn't she in charge of enforcing that policy? Correct, Your Honor. In Edgerly, the sergeant at the substation was also in charge of enforcing the policy, and this Court found that he could not be held individually liable for simply enforcing the policy because he was not a policymaker. So your argument is that Mims had no discretion, she was under an order that was clear from this policy as to where to put this man? She was under an order from both the Superior Court and from the California Penal Code and also from the general policy of the Sheriff's Department. What was the general policy that forced her to do this? The general policy of the Sheriff's Department is that SVP civil detainees per the California Penal Code are not to be housed with either criminal pretrial detainees, criminal post-sentence detainees, and also they cannot be housed with civil detainees. Okay. So what required her to put him in isolation and deprive him of all privileges that are normally given to a prisoner or another, shall we say, a criminal? If it's not a prisoner, I guess he's being held for some other reason. At this time, at the time of this incident in 2005, the Fresno County Jail did not have a separate facility for SVP civil detainees. They did for regular civil detainees, but because of the Penal Code stating that they cannot be housed with civil detainees, the only other available or only other alternative was isolation. Let's break it down into two components. I think Judge Rustani asked you about that. One is location. There's only one location, isolation or the whole location. But there's another component to the inmate's daily life, which is privileges. Now, what evidence do we have in the record that whilst she was in isolation, Mr. Kitchens could not be let out for more than 10 minutes every other day, could not have a shower every day, could not go to watch television? What evidence do we have to justify the lack of privileges for putting location on one side? And did you not have enough people at the Fresno Jail to keep an eye on him, to let him out for two or three hours a day? If that's so, suppose you didn't. Where in Mr. Johnson's affidavit is there any mention as to the circumstances which prevented the privileges from being extended to Mr. Kitchens? Well, Your Honor, just for clarity of the record, Pelley Johnson, he is the lieutenant of the classification unit. He had no direct participation in the classification. He just simply – Now, Your Honor, give me any indication in the record as to why the privileges which were extended to people in MSCG or in the general population were not extended to Mr. Kitchens. Your Honor, at that time in 2005, based on the requirements on the penal code and housing, there simply wasn't another space for them. There wasn't sufficient – You're talking about location. No. Leave that to one side. Yes. Let's suppose there wasn't any other location. He had to be put in isolation or in the hole, Now, what evidence is in the record that, whilst he was there, he could not be granted the privileges which other criminal detainees had? Based on the record, Your Honor, I don't believe there is a –    I don't believe there is a criminal detainee. It's clear in the record. It's not clear. It's not existent. There's nothing. Again, Your Honor, I guess the central issue here, though, is whether or not MIMS, appellee MIMS and appellee Johnson can be held liable in their individual capacities as supervisors. There are no other appellees, there are no other defendants in this case aside from MIMS and Johnson in their individual capacity. I didn't hear you say – you told me what the policies were regarding space. You did not say that there was a policy that they were dictated to from on high that said, You may give these people no privileges. Your Honor, there wasn't a policy that said that SVPs were provided no privileges. And, in fact, Mr. Kitchens wasn't provided no privileges. He had a limited set of privileges based on security concerns and how – and – Where is the evidence of any security concerns? The security concerns is both for – it's in – we have – Do we have any? We have argued it in our – presented the issue in our briefing.  I asked for evidence. It would be, I believe, in the declaration from Mr. Johnson and possibly the declaration from appellee MIMS, and also it may be – there's two other declarations I can – I believe is the declaration of Ms. Clark, and there was one other declaration. The name is escaping me at the moment. That's where we should look to see if there's any factual statements regarding security concerns which required Mr. Kitchens to have 10 minutes outside his cell every other day. Correct? I believe that's where the Court will find – All right. We've taken you over your time. Thank you. Thank you very much. Would you like a moment, a minute for rebuttal? Briefly, Your Honor, just a few points. First of all, you can look at those affidavits. You won't find anything in them. Second of all, in terms of the personal liability, it is not conceded that Ms. MIMS and Mr. Johnson had no policymaking authority. There is no evidence in the record that states that. And, in fact, the only thing that they cited in their brief was Section 4000 of the that the sheriffs are responsible for overseeing the jails. There's nothing here that says that they were dictated by the sheriff, by the Board of Supervisors, that all of these restrictions had to be taken away from him. And there is – definitely a jury could infer that in their – Ms. MIMS was responsible for the entire jail, that there was at least some policymaking authority that she had. Additionally, there's no – the counsel for the county defendants makes the point that they did not know specifically about Mr. Kitchens' status. But there's no requirement for that in this Court's law under Redmond and under Starr v. Baca. If they knew that SBPA detainees were coming in, they knew that the policy was to put them into isolation and that they would restrict all of their privileges in isolation, that's enough for them to have acquiesced and for – for – I don't believe that there were any findings for that. I – I don't believe so. The last point that I want to make as to the transport defendants, their argument is that Section 4002a does not apply because Mr. Kitchens was a pretrial detainee as opposed to having actually been committed.  have to be afforded at least as many rights as they would receive had they been actually civilly committed at a juvenile. Thank you. Thank you very much. And you're here under our pro-bono program? Yes, yes, Your Honor. I – I want to thank you. I mean, over 40 percent of our cases are pro bono on one or two sides, and every now and then we find a case, as we did here, that needed a lawyer to really do a good job for them. And we compliment you for doing this as an officer of the court. We hope you're – the experience is also helpful to you also. But whether it is or not, you've done a fine job representing – and the court thanks you. Thank you, Your Honor, and I appreciate the court having the program and giving me opportunities like this. Thank you.
judges: Restani, Wallace, Bea